IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


TODD J. DELAY,

               Plaintiff,

     vs.                          Civil Action 2:07-CV-568
                                      Magistrate Judge King

ROSENTHAL COLLINS GROUP,
LLC,

               Defendant.


## OPINION AND ORDER

    Plaintiff Todd J. Delay brings this action against defendant
Rosenthal Collins Group, LLC ("defendant" or "RCG"), seeking
indemnification for legal fees and expenses that he allegedly incurred
defending himself in a civil action brought by the Commodity Futures
Trading Commission ("CFTC" or the "Commission").  This Court is vested
with diversity jurisdiction under 28 U.S.C. § 1332.  With the consent
of the parties, 28 U.S.C. § 636(c), trial to the Court began on
December 10, 2012 and concluded on December 12, 2012.  Plaintiff
appeared and testified at trial, as did Douglas Kitchen, RCG's
Managing Director since 1999, Maureen Downs, President of RCG since
2007, and Burton Meyer, who testified as an expert in the futures
brokerage industry.

I.    **Defendant's Motion for Directed Verdict**

    Counsel for defendant moved for a directed verdict after the
close of plaintiff's case-in-chief.  The Court construed defendant's
motion as a request for judgment on partial findings pursuant to Rule

52(c) of the Federal Rules of Civil Procedure and reserved ruling on the motion until the close of the evidence.  Pursuant to the provisions of Rule 52(a), the Court now makes the following findings of fact and conclusions of law.[1]  *See* Fed. R. Civ. P. 52(c) (providing that a court, during a nonjury trial, may "decline to render judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)").

## II.  Findings of Fact

Defendant RCG is a limited liability company formed and existing under the laws of the State of Illinois.  *Uncontroverted Facts*, as set forth in the *Final Pretrial Order*,[2] Doc. No. 113, p. 3.  Defendant is a Futures Commission Merchant ("FCM") operating numerous trading desks on the floors of the Chicago Board of Trade and the Chicago Mercantile Exchange ("CME").  *Id*.  An FCM is a commodities broker that is registered with the CFTC[3] and the National Futures Association ("NFA").  An FCM is statutorily defined as

an individual, association, partnership, corporation, or trust-

(i) that--

(I) is--

(aa) engaged in soliciting or in accepting orders
for-

---

[1] Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law deemed to be a finding of fact, should be so construed.
[2] *Uncontroverted Facts* are set forth in the *Final Pretrial Order*, Doc. No. 113, and have been stipulated to by the parties.
[3] The CFTC is an independent federal agency responsible for administering and enforcing the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, and, pursuant to 7 U.S.C. § 13a-1, is specifically authorized to seek injunctive relief and civil penalties for violations of the Act.  *Uncontroverted Facts*, p. 4.

> (AA) the purchase or sale of a commodity for future delivery;
>
> . . .
>
> (bb) acting as a counterparty in any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or 2(c)(2)(D)(i) of this title; and
>
> (II) in or in connection with the activities described in items (aa) or (bb) of subclause (I), accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or
>
> (ii) that is registered with the Commission as a futures commission merchant.

7 U.S.C. § 1a(28)(a). *See also Uncontroverted Facts*, pp. 3-4.

As an FCM, defendant can clear trades only in the futures market. The futures market involves the purchase and sale of commodities futures contracts, which are standard contracts traded on a regulated exchange for a specific quantity of a specific commodity to be bought or sold at a certain price and time. The futures market is a zero-sum market; for every futures contract sold, there must be a corresponding purchase. Futures contracts are settled, depending on the commodity at issue, with either cash or physical delivery of the commodity.

As an FCM, defendant cannot clear trades in the cash market. The cash market involves the purchase and sale of physical commodities, such as cattle, corn, or beans.

Plaintiff Todd Delay is an active farmer, cattleman and commodity broker with over eighteen years of experience in the futures and securities industries, with a focus on agricultural markets. In the late 1990s, Douglas Kitchen, the Managing Director of RCG since 1999,

contacted plaintiff in an effort to recruit him to work for defendant. At that time, plaintiff owned a large farm in Columbus, Ohio and had between 100 and 150 futures clients who generated between $500,000 and $1,000,000 in annual commissions. Some of plaintiff's largest clients were cattle feedlots in Nebraska, such as North Platte Feeders, Imperial Beef, and Dinklage Feedyard.

During the recruitment process, plaintiff discussed his futures clientele, farming business and involvement in the feeder cattle cash market with Mr. Kitchen. Plaintiff testified that he also informed Mr. Kitchen that he held an equity or ownership interest in cattle on feed in Nebraska. Mr. Kitchen testified that he thought that plaintiff acquired that interest after becoming employed by RCG. Plaintiff discussed his involvement in these areas with Mr. Kitchen because he believed that these varied interests gave him an advantage in developing trading strategies, making recommendations, and developing and retaining futures clients.

A.   **Delay's employment with RCG**

Plaintiff negotiated a Branch Office Agreement (the "Agreement") with Maureen Downs acting on behalf of RCG and, effective January 19, 2002, plaintiff assumed the position of Branch Manager of defendant's Columbus office. *See Joint Exhibit 1; Uncontroverted Facts*, p. 4. Plaintiff testified that he joined RCG because, under the Agreement, his clients would pay lower commissions and he would receive higher commissions. Generally, plaintiff would charge clients $30 to $40 per futures contract, as determined by plaintiff. From that amount, RCG

4

received $8 to $12 per contract, of which 25 cents was paid to Mr. Kitchen.

Under the Agreement, RCG was required to establish a branch office[4] in Columbus, Ohio "to accommodate the futures business of Delay" and to supervise other brokers that Delay introduced to RCG. *Joint Exhibit 1*, ¶ 1. Plaintiff also agreed to assume financial responsibility for all "operating costs" of the branch office "including, but not limited to rent, utilities, maintenance, quotes, communications, supplies, furniture, equipment, promotion, travel, entertainment, property and casualty insurance, staff salaries, professional fees and postage." *Id.* at ¶ 7.

The Agreement permitted plaintiff to submit invoices for branch office operating expenses to RCG, which would then pay the invoice and deduct a corresponding amount from plaintiff's gross commissions or escrow account. *Id.* at ¶ 10. Under this system, RCG prepared a statement for plaintiff within 15 days of the end of every calendar month that calculated the total amount payable to plaintiff for the month. Plaintiff received net monthly commissions equal to the gross commissions charged to his clients, less RCG's portion of the gross commissions, less expenses RCG paid on plaintiff's behalf. *See id.* at ¶¶ 10, 12; *Defendant's Exhibit E*.

Plaintiff and the other brokers operating from the Columbus, Ohio, branch office were RCG employees for tax purposes and were registered with the CFTC as "associated persons"[5] of defendant. *See*

---

[4] A branch office is a remote location of an FCM.
[5] An associated person is also referred to as a broker.

*Uncontroverted Facts*, p. 4. An associated person is statutorily defined as a natural person who is associated with an FCM as an employee "in any capacity which involves (i) the solicitation or acceptance of customers' or option customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged." 17 C.F.R. § 1.3(aa)(1). An associated person must be registered with the CFTC in accordance with its regulations. *See* 7 U.S.C. § 6k(4) (requiring any person who wants to be registered as an associated person of a futures commission merchant to apply to the CFTC and continue to report and furnish to the CFTC any information as the Commission may require); 17 C.F.R. § 3.12(a) (making it unlawful for a person acting as an associated person to fail to register with the CFTC); 17 C.F.R. § 3.12(c) (setting forth the requirements for registration as an associated person). Plaintiff was also registered as a branch manager of RCG.

The Agreement was terminated in early September 2003.

**B. The Chicago Mercantile Exchange and Cattle Futures**

Live cattle futures and feeder cattle futures both trade on the Chicago Mercantile Exchange ("CME"). Live cattle futures represent the value of "live" or "fat" cattle that have been fed and are ready for slaughter. Each live cattle futures contract represents 40,000 pounds, or approximately 32 head of cattle weighing 1,250 pounds each. *Plaintiff's Exhibit 13*. Feeder cattle futures contracts represent the value of 700-850 pound steers that have been weaned off a cow and are ready to be fed, with each contract representing 50,000 pounds. *Id*.

Feeder cattle futures settle to the price of the CME Feeder Cattle Futures Index on the contract expiration date, which is generally the last Thursday of the contract month.  The CME calculates that index on a daily basis according to the cash feeder cattle prices reported to the USDA from a twelve state region consisting of North Dakota, South Dakota, Montana, Wyoming, Nebraska, Oklahoma, Texas, Colorado, New Mexico, Missouri, and Iowa.  Although the CME encourages the reporting of transactions, the index includes only direct sales in the cash market that are voluntarily reported to the USDA by cattle purchasers.

Dealers in the cash cattle markets, such as ranchers and feedlot operators, can use futures to hedge their risk in the cash market. The objective of this strategy, which often takes the form of having an equal and opposite position in the futures and cash markets, is to fix the price of a commodity and transfer the risk of price change to a third party through the futures market.  The speculative purchase of futures contracts, unlike hedge purchases, can be done without any corresponding involvement in the cash markets.

## C.  Market Perceptions reports

Prior to joining RCG in 2002, plaintiff was a broker and a grains and oilseed analyst for Paine Webber.  In that position, plaintiff researched United States Department of Agricultural ("USDA") reports and used his knowledge of the agricultural markets to develop investment strategies and recommendations for his clients.  Plaintiff detailed these strategies in "Market Perceptions" reports that he provided to clients and prospective clients on a regular basis.  After

joining RCG, plaintiff continued to research agricultural markets, to develop investment strategies and to make recommendations to clients through the use of reports. Plaintiff distributed the reports to solicit new accounts and to generate futures business. RCG was aware that plaintiff developed and distributed reports when he worked for Paine Webber, and it knew that plaintiff continued to do so as an RCG employee. In fact, plaintiff sent RCG a copy of the reports before he distributed them to clients and prospective clients.

In July 2003, plaintiff recommended in his Market Perceptions report a "cattle crush" (or paper feedlot) investment strategy. *Plaintiff's Exhibit 13*, p. 42. Plaintiff believed that volatility in the cash cattle market, a consequence of a reported case of mad cow disease in Canada, combined with low cattle and high feed numbers made the cattle crush strategy attractive. He also concluded that Nebraska cattle sales, which were typically higher than sales in such other states as Texas, were under-reported. On September 19, 2003, plaintiff recommended selling two February 2004 live cattle futures contracts, buying one October 2003 feeder cattle futures contract, and buying one December 2003 corn futures contract "with crush values around $4,700 - $5,000 looking to cover this short position in the $3,800 area." *Plaintiff's Exhibit 7*, p. 1. *See* also *Plaintiff's Exhibit 13*, p. 42 (detailing the December 2003 cattle crush strategy).

Plaintiff and at least some of his clients bought October CME feeder cattle futures contracts after plaintiff distributed the Market Perceptions reports detailing the cattle crush investing strategy. On October 1, 2003, plaintiff and his clients held 58 CME feeder cattle

8

futures contracts. *Plaintiff's Exhibit 13*, at p. 264-266. That
number increased to a high of 647 contracts on October 28, 2003. *Id*.

    **D.   The five transactions**

In October 2003, plaintiff owned an equity interest in
approximately 5000-6000 cattle in Nebraska. Some of plaintiff's
futures clients also held ownership interests. Plaintiff, on behalf
of the cattle owners, negotiated contracts (both oral and written) for
the sale of approximately 5000 cattle to two feedlots in Nebraska.
The sales took the form of five different transactions during the last
week of October 2003. Plaintiff worked with the feedlots to
successfully report all five transactions to the USDA. Two of the
sales were cancelled after they were reported.

Plaintiff testified that he decided to sell the cattle because
the sale would result in a profit to the owners, would create an
opportunity to move money from the cash market to the futures market,
and would, if reported, have a positive impact on the futures index.

Plaintiff also testified that he encouraged the feedlots to
report the transactions because reporting would result in a more
accurate market, would render the futures index "more robust" and
would increase the value of feeder cattle futures contracts.
Plaintiff encouraged this reporting with the express intention of
moving the CME Feeder Cattle Futures Index. He was confident, based
on his research, that reporting the transactions would move the CME
Feeder Cattle Futures Index.

In October 2003, approximately 10,000 cattle purchases were
reported to the USDA and included in the CME Feeder Cattle Futures

Index.  The five transactions negotiated by plaintiff accounted for approximately 50 percent of the reported purchases.  The reported sales had the desired effect on the CME Feeder Cattle Futures Index and, as a result, plaintiff and his futures clients who followed his recommendation realized approximately $1,000,000 over a period of 7-10 days.  Had the five transactions not been reported, plaintiff and his clients would have realized only a negligible profit.

### E.    The Nebraska Action

On September 29, 2005, the CFTC filed a civil action against plaintiff[6] in the United States District Court for the Northern District of Illinois.  *Joint Exhibit 2*.  The case was subsequently transferred to the United States District Court for the District of Nebraska (the "Nebraska Action").  *Uncontroverted Facts*, p. 4.

The CFTC charged plaintiff with violations of the Commodity Exchange Act for allegedly manipulating the October 2003 Feeder Cattle Futures Contract traded on the CME (Count 1), attempting to manipulate the October 2003 Feeder Cattle Futures Contract traded on the CME (Count 2), and knowingly delivering false, or misleading, or inaccurate reports concerning market information to the USDA that tended to affect the price of feeder cattle (Count 3).  *Joint Exhibit 1, pp. 17-18; Uncontroverted Facts*, p. 4.

The CFTC also alleged that plaintiff violated Section 4a(e) of the Commodity Exchange Act by exceeding the speculative position limits for the October 2003 Feeder Cattle Futures Contract (Count 4)

---

[6] Jack McCaffery and John D. Lawless, who were also named defendants, *see Joint Exhibit 2*, p. 1, were dismissed as defendants before the trial, without prejudice, in exchange for their truthful testimony.  *Joint Exhibit 3*, p. 7.

and that plaintiff violated CFTC regulation 166.3 by failing to
diligently supervise defendant's Columbus, Ohio, office (Count 5).
*Joint Exhibit 1*, pp. 19-20; *Uncontroverted Facts*, pp. 4-5.

After the first day of trial in the Nebraska Action, plaintiff
and the CFTC stipulated to the dismissal of Count 4 and Count 5.
*Uncontroverted Facts*, p. 5.  With respect to the alleged actions and
omissions in Count 4 and Count 5, it is an "uncontroverted fact" that
"[p]laintiff was acting within the scope of his employment and agency
with [d]efendant." *Id*. at p. 5.  Plaintiff is not seeking
indemnification for his defense against Counts 4 and 5.

As to Counts 1-3, it was alleged that plaintiff violated section
9(a)(2) of the Commodity Exchange Act, which makes it unlawful for

> [a]ny person to manipulate or attempt to manipulate the
> price of any commodity in interstate commerce, or for
> future delivery on or subject to the rules of any
> registered entity, or of any swap, or to corner or attempt
> to corner any such commodity or knowingly to deliver or
> cause to be delivered for transmission through the mails or
> interstate commerce by telegraph, telephone, wireless, or
> other means of communication false or misleading or
> knowingly inaccurate reports concerning crop or market
> information or conditions that affect or tend to affect the
> price of any commodity in interstate commerce . . . .

7 U.S.C. § 13(a)(2).  Specifically, it was alleged that plaintiff
engineered five "sham" or non-"*bona fide*" transactions in the cash
feeder cattle market with the purpose of reporting a sale to the USDA
so that it would affect the October 2003 CME Feeder Cattle Futures
Contract by causing the contract to settle at an artificially high
price. *Joint Exhibit 2*, ¶¶ 33, 38, 42, 48, 53, 54.

All claims asserted by the CFTC against plaintiff in the Nebraska
Action involved alleged acts and omissions on the part of plaintiff

11

during the time that he was an employee and associated person of defendant. *Uncontroverted Facts*, p. 4.

On November 17, 2006, the Honorable Richard G. Kopf of the United States District Court for the District of Nebraska issued a *Memorandum and Order* finding that the five transactions were "real" transactions, that the reports to the USDA concerning the five transactions were true, that plaintiff did not manipulate or attempt to manipulate a cattle futures contract, and that plaintiff did not violate the Commodity Exchange Act. *Joint Exhibit 3; Uncontroverted Facts*, p. 5. Judge Kopf concluded that "the five feeder cattle transactions Delay initiated in mid-October 2003 were legitimate business deals" that were properly reported to the USDA. *Joint Exhibit 3*, p. 5.  He further found that

> Delay and his investors admittedly realized profits in the
> futures market as a result of these feeder cattle
> transactions, but they were lawful profits.  Simply stated,
> it is not a violation of the statute to report feeder
> cattle sales to the USDA with the intention of moving the
> CME index up or down — rather, to be unlawful, the reported
> sales must be sham or nonexistent transactions, or the
> reports must be knowingly false or misleading.  In this
> case, it turns out that the sales were real and the reports
> were true.

*Id*. at pp. 5-6.

### F.   CME Business Conduct Committee

Plaintiff was also charged with rule violations by the CME Business Conduct Committee.  On March 16, 2006, the CME concluded that plaintiff had violated CME Rule 432.Q by accumulating positions in excess of the speculative position limit for the October 2003 Feeder Cattle Futures Contract. *Uncontroverted Facts*, p. 5.  The CME also

concluded that, throughout October 2003, plaintiff had violated CME Rule 536 by placing orders on behalf of his customers without readily identifying, until after the orders were filled, the specific accounts for which the orders were placed, the accounts for such orders which went unfilled and the accounts for such orders which were filled. *Id*.

Plaintiff initially testified at trial that the CME charges were settled. He conceded on cross examination, however, that the "settlement" to which he referred was his decision not to appeal the imposition of a $50,000 fine and a cease and desist order.

Plaintiff does not seek indemnification for legal fees incurred in connection with the CME proceeding.

**G.    Legal fees and expenses**

Plaintiff seeks indemnification from defendant in the amount of $1,023,142.21, that amount reflecting legal fees and expenses allegedly incurred in defending Counts 1-3 of the Nebraska Action. *See Supplemental Joint Stipulation Regarding Plaintiff's Damages* ("*Damages Stipulation*"), Doc. No. 128.  Plaintiff does not seek indemnification for expenses incurred in connection with Counts 4 and 5 of the Nebraska Action or for defending himself before the CME Business Conduct Committee.

Plaintiff did not consult with defendant prior to hiring attorneys or incurring these expenses, and he did not seek indemnification for the expenses prior to the filing of this action. Plaintiff testified at trial that he did not seek indemnification sooner because he was concentrating on defending against the claims against him.

13

The parties stipulate that $864,931.36 of the amount sought are reasonable and commensurate with the work performed, were related to plaintiff's defense of the Nebraska Action, and would be recoverable if defendant is required to indemnify plaintiff for the costs and expenses of defending the Nebraska Action. *Id*. at p. 1. These expenses include legal fees charged by Baker & Hostetler in the amount of $765,806.07, expert fees in the amount of $78,567.58, deposition expenses in the amount of $10,251.21, and trial expenses in the amount of $10,306.50. *Id*.

Plaintiff also seeks $148,210.85 in fees paid to the law firm Katten Muchin and $10,000 in fees paid to one Mr. Markham. *Id*. at pp. 1-2. The parties stipulate that these amounts are reasonable and commensurate with work performed. *Id*. However, defendant maintains that these amounts were not incurred in connection with plaintiff's defense against the Nebraska Action. *Id*.

Plaintiff retained Katten Muchin to represent him prior to the initiation of the Nebraska Action. The firm prepared and submitted a Wells Submission to the CFTC on plaintiff's behalf. Katten Muchin also represented plaintiff when he was deposed by the CFTC and CME. *Plaintiff's Exhibit 5*.

Plaintiff testified that Mr. Marcum was retained as an expert to advise Baker & Hostetler in selecting a jury in the Nebraska Action.[7]

---

[7] After the first day of trial in the Nebraska Action, the parties agreed that the case would proceed as a trial to the court. *Joint Exhibit 3*, p. 1 n.1.

**H.    Plaintiff's Duties and Responsibilities**

The facts underlying this case are not generally in dispute. Testimony diverges, however, on the scope of plaintiff's duties and responsibilities as an associated person and branch manager of RCG.

Plaintiff testified that he was employed as an associated person to open futures accounts and to effectuate futures trades.  His duties as an associated person and branch manager included making recommendations to clients about trading futures, servicing futures clients, reviewing account equity runs, notifying clients if margins or deposits were required, and responding to questions that RCG might have regarding futures accounts.  Plaintiff developed and sent reports to clients and prospective clients as a means of providing futures advice and encouraging new futures accounts.

Plaintiff acknowledged that buying and selling cattle in the cash market was not necessarily part of his job as a broker, but he takes the position that formulating investment strategies and his efforts to encourage purchasers to report cash transactions fell within the scope of his authorized duties.  According to plaintiff, those efforts benefited RCG's clients, were encouraged by the CME, and rendered the index more robust and accurate.  Moreover, RCG realized commissions on all futures contracts that were purchased as part of plaintiff's strategy.

Douglas Kitchen testified that an associated person's duties and responsibilities include soliciting customer business, opening new accounts, advising customers, and executing trades on exchanges for customers.  According to Mr. Kitchen, the duties of an associated

person registered with the CFTC do not include activity in the cash market or encouraging clients to report transactions in the cash markets. Mr. Kitchen also testified that the duties and responsibilities of a branch manager are the same as those of an associated person, but that a branch manager must also supervise other associated persons and deal with regulatory compliance in the branch. Branch managers have no role in the cash markets.

According to Mr. Kitchen, plaintiff was hired to solicit customer business, to open accounts, to execute commodities contracts for customers, to offer advice to clients, and to develop strategies in the futures markets; he was not hired to attempt to influence the futures markets nor did his authorized job duties include such activity.

Maureen Downs testified that plaintiff was hired to solicit and to service futures customers. Solicitation involves bringing new customers to RCG for the purpose of trading futures. She acknowledged that an associated person is not limited to a particular geographic region and that efforts to solicit new customers can take a variety of forms, including holding seminars and writing articles. Servicing customers involves entering orders, answering questions, making margin calls, assuring that transactions are properly understood by customers, and processing transactions. According to Ms. Downs, an associated person can advise clients, but it is not part of an associated person's duties to encourage reporting in the cash market.

Burton Meyer testified regarding plaintiff's duties and responsibilities within the scope of the Agreement. According to Mr.

Meyer, plaintiff's duties included supervising brokers, soliciting clients for futures trades on regulated markets, passing customers along to RCG, servicing futures clients, providing investment advice, answering questions about futures contracts and trading activity, and obtaining USDA reports and informational pamphlets for clients. According to Mr. Meyer, buying and selling commodities in the cash markets does not fall within the scope of the duties enumerated in the Agreement.

## III. Discussion

Plaintiff's indemnification claim is governed by Illinois law. *See Opinion and Order*, Doc. No. 85, p. 5. An implied right to indemnification under Illinois common law has been recognized "to cover situations in which a faultless agent is subject to liability for acts taken on behalf of a principal." *Livingston v. Prime Auto Credit, Inc.*, No. 00C2985, 2000 WL 1898502, at *2 (N.D. Ill. Dec. 21, 2000). In such a case, "a faultless agent may state a claim for implied indemnity against its principal where the agent was acting within the scope of the agency relationship." *Id.* (citing *Ores v. Willow W. Condo. Ass'n*, No. 94C4717, 1998 WL 852839, at *8 (N.D. Ill. Nov. 30, 1998); *Byrton Dairy Prods., Inc. v. Harborside Refrigerated Servs., Inc.*, 991 F.Supp. 977, 986 (N.D. Ill. 1997)). In order to state a claim for an implied right to indemnification, the agent must establish: (1) that he was acting within the scope of his agency, and (2) that he was faultless. *Id.*

As to the first element of the claim, conduct of an agent falls within the scope of the agency only if:

17

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; [and]

(c) it is actuated, at least in part, by a purpose to serve the master.

*Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007) (quoting *Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989)) (quotations omitted). *See also Adames v. Sheahan*, 909 N.E.2d 742, 754-55 (Ill. 2009) ("This court has held that all three criteria of section 228 [of the Restatement (Second) of Agency] must be met in order to conclude that an employee was acting within the scope of employment."); Restatement (Second) of Agency § 228 (1958). "'Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" *Bagent*, 862 N.E.2d at 992 (quoting *Pyne*, 543 N.E.2d at 1308). "These criteria have been elaborated." *Pyne*, 543 N.E.2d at 1309 (citing Restatement (Second) of Agency § 229 (kind of conduct), § 230 (forbidden acts), § 233 (time), § 234 (space), § 235 (purpose not master's), § 236 (dual purpose), § 237 (reentry to scope)).

"To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." Restatement (Second) of Agency § 229(1). "[I]n determining whether the complained-of act of the employee, although not authorized by the employer, is nevertheless so similar to or incidental to employer-authorized conduct as to be within the scope of employment," the following matters of factors are to be considered:

18

whether the act is one commonly done by such employees; the
time, place, and purpose of the act; the previous relations
between the employer and the employee; whether the act is
outside the enterprise of the employer or, if within the
enterprise, has not been entrusted to any employee; whether
the employer has reason to expect that such an act will be
done; the similarity in quality of the act done to the act
authorized; whether the employer furnished to the employee
the instrumentality by which the harm is done; [] the
extent of departure from the normal method of accomplishing
an authorized result, [and whether the act is seriously
criminal].

*Bagent*, 862 N.E.2d at 993, 993 n.1 (citing Restatement (Second) of
Agency § 229(2)). "These factors refer primarily to the 'physical
activities' of employees." *Id*. "The ultimate question is whether or
not the loss resulting from the employee's acts should justly be
considered as one of the normal risks to be borne by the employer."
*Id*. (citing Restatement (Second) of Agency § 229, Comment *a*).

Plaintiff seeks indemnification for expenses incurred in
connection with his defense against the claims pursued against him in
the Nebraska Action.  It is therefore the activities that gave rise to
those claims that are at issue in this case.  The parties disagree on
this point.  Plaintiff takes the position that it was his investment
strategy, which included encouraging cattle buyers to report
transactions in the cash market, that gave rise to the Nebraska
Action.  This Court disagrees with that position.

The CFTC charged plaintiff with violating section 9(a)(2) of the
Commodity Exchange Act.  Specifically, the CFTC alleged that plaintiff
engineered five "sham" or non-"*bona fide*" transactions in the cash
feeder cattle market with the purpose of reporting sales to the USDA
and thereby affect the October 2003 CME Feeder Cattle Futures Contract

19

by causing it to settle artificially high.  *Joint Exhibit 2*, ¶¶ 33, 38, 42, 48, 53, 54.

The claims pursued in the Nebraska Action are premised on plaintiff's involvement in the five transactions in the cash feeder cattle market.  This is reflected in Judge Kopf's November 17, 2006 *Memorandum and Order*, which focuses almost entirely on the validity of the five transactions.  *See Joint Exhibit 3*.  Plaintiff could have been held liable in the Nebraska Action only if the five transactions were "sham or nonexistent transactions."  *See id*. at pp. 5-6 ("Simply stated, it is not a violation of the statute to report feeder cattle sales to the USDA with the intention of moving the CME index up or down—rather, to be unlawful, the reported sales must be sham or nonexistent transactions, or the reports must be knowingly false or misleading.").  Judge Kopf held that Delay "did not knowingly engineer sham transactions as claimed by the" CFTC.  *Id*. at p. 1.  The fact that the five transactions were legitimate business deals that were properly reported to the USDA, *see id*., does not alter the fact that the five transactions are the activities that gave rise to the claims pursued against plaintiff in the Nebraska Action.  Indeed, plaintiff conceded on cross examination that he was charged in the Nebraska Action with the manipulation and the attempted manipulation of the CME Feeder Cattle Index as a result of the five transactions in the cash market.

Having determined that it was plaintiff's involvement in the five transactions in the cash feeder cattle market that constituted the activity at issue in the Nebraska Action, this Court concludes that

20

such activity did not fall within the scope of plaintiff's employment with RCG.  As plaintiff himself testified, buying and selling cattle in the cash market was "not necessarily" part of his job as an associated person of RCG.

Plaintiff testified that he was employed to open futures accounts, to trade futures, and to solicit and service futures clients.  As an FCM, RCG operates only in the futures market and cannot clear transactions in the cash market.  Engaging in transactions in cash commodity markets therefore falls outside the enterprise of RCG. Neither plaintiff nor RCG's other employees commonly engaged in such activity.

Differences in the futures and cash markets suggest that engaging in cash transactions is qualitatively different from engaging in futures transactions.  An associated person who deals in futures is regulated by the CFTC, NFA, and the exchange on which the contracts are traded.  In contrast, the cash market involves the sale and purchase of actual commodities, the commodities are not traded on a regulated exchange, cash market contracts are negotiated, not standard, and of course, nearly any person can buy and sell in the cash market.

All claims pursued by the CFTC against plaintiff in the Nebraska Action involve plaintiff's activities during the time that he was an employee and associated person of RCG.  *Uncontroverted Facts*, p. 4. The acts also occurred within the authorized space limits of plaintiff's employment; there is uncontroverted testimony that RCG knew that plaintiff solicited and serviced futures business in

21

Nebraska. However, RCG had no reason to expect that plaintiff, acting as its employee, would engage in transactions in the cash market or encourage the reporting of transactions in the cash market. Plaintiff was not employed to engage in such transactions, nor was he employed to try to influence the futures markets. Moreover, there is no evidence that plaintiff had previously entered into cash market transactions on behalf of RCG. The Agreement provides that RCG was required to establish a branch office in Columbus, Ohio "to accommodate the *futures business* of Delay." *Joint Exhibit 1*, ¶ 1 (emphasis added). Further, RCG operates only in the futures market, it cannot clear transactions in the cash market, and it does not earn a fee on transactions in the cash market. Although RCG had notice of plaintiff's Market Perception reports and his cattle crush investment strategy, the reports detailing this investment strategy did not mention plaintiff's cash transactions or his efforts to encourage the reporting of cash cattle transactions. There is no evidence that RCG knew or should have known that plaintiff would enter into transactions in the cash feeder cattle market.

Simply put, engaging in transactions in the cash cattle market is not conduct of the kind plaintiff was employed to perform for RCG. As to the five transactions specifically, RCG was not involved in any way with the transactions; it did not clear funds, place orders, receive a commission, or make any money on the transactions.

Plaintiff testified that it was part of his job to acquire knowledge, to develop strategies and to make recommendations to clients. Maureen Downs, Douglas Kitchen and Burton Meyer agreed that

22

plaintiff, as an associated person, was permitted to provide
investment advice to futures clients.  Indeed, and as Mr. Kitchen
testified, knowledge of the cash markets can assist an associated
person in developing strategies and making recommendations to futures
clients.  Nevertheless, as discussed *supra*, the claims pursued in the
Nebraska Action were not premised on such activity.  In negotiating
and executing the five transactions, plaintiff did not simply use his
knowledge to advise clients as to a recommended course of action in
the futures market; he actually left the futures market and entered
the cash market.

Plaintiff personally took action in the cash feeder cattle market
with the express intention of moving the October Feeder Cattle Futures
Index.  This activity was not even incidental to the duties that
plaintiff was employed to perform. In October 2003, approximately
10,000 cattle purchases were reported to the USDA and included in the
CME Feeder Cattle Futures Index.  The five transactions in which
plaintiff participated comprised approximately 50 percent of the
reported purchases for that period.  Plaintiff's actions had a
substantial impact on the cash market and the CME Feeder Cattle
Futures Index.

Plaintiff testified that he decided to sell the cattle because
the sale would profit the owners, would give the owners an opportunity
to move money from the cash market to the futures market and, if
reported, would have a positive impact on futures positions.
Plaintiff also testified that he encouraged the reporting of the
transactions, in part, because the CME Feeder Cattle Index would be

23

changed by such reporting.  The first of these justifications is wholly personal and in no way implicates plaintiff's employment with RCG.  The fact that RCG clients may have acquired more available cash to invest in the futures market as a result of any profit realized by them is too tangential to plaintiff's duties as RCG's employee to bring his activity in the cash market into the scope of his authorized duties.  The mere fact that the cash transactions were not illegal is, of course, irrelevant to this analysis.

As noted, plaintiff was employed to solicit and to service futures customers.  Although the solicitation and servicing of customers can take many authorized forms, engaging in transactions in the cash feeder cattle market is not one of them.  As plaintiff conceded on cross examination, the index manipulation alleged in the Nebraska Action was not a result of any action that he or his customers took in the futures market.  Plaintiff left the futures market and entered the cash market.  Defendant had no reason to expect plaintiff to engage in cash transactions in his capacity an associated person or branch manager, and it received no direct benefit from plaintiff's actions in that regard.  Plaintiff's actions were therefore different in kind from those he was employed to perform, his actions did not fall within the scope of his employment with RCG, and he is not entitled to indemnification for expenses incurred in connection with the Nebraska Action.

**IV.   Conclusions of Law**

This Court has jurisdiction over the claims asserted in this diversity action under 28 U.S.C. §§ 1332, 636(c).  The Court is vested with personal jurisdiction over the parties.

The Court concludes that, for the reasons stated *supra*, plaintiff has failed to establish his claims against defendant.  Specifically, the Court concludes that plaintiff's conduct giving rise to the claims pursued against him by the CFTC in the Nebraska Action did not fall within the scope of plaintiff's employment with defendant.  Plaintiff is not entitled to indemnification from defendant for expenses incurred by him in connection with the Nebraska action.

The Clerk shall enter **FINAL JUDGMENT** in favor of defendant.


December 27, 2012                    *s/ Norah McCann King*
                                     Norah M$^{c}$Cann King
                               United States Magistrate Judge